30067. GEORGIA RAILROAD & BANKING COMPANY *v.*
LOKEY.

DECIDED MAY 12, 1943.

*Cumming, Harper & Nixon,* for plaintiff in error.
*Stevens & Stevens,* contra.

FELTON, J. (After stating the foregoing facts.)

With reference to the collision the plaintiff, testified: "My automobile collided with a Georgia Railroad engine in Thomson on March 2 of this year. I was in the automobile going from my home to the station. I had to cross the Georgia Railroad tracks to get from my home to the station. By station I mean my gasoline filling-station. . . That is about 40 or 50 yards from the Georgia Railroad track. I left home that morning between 7:30 and a quarter to eight, fast time. The weather was foggy and raining and very misty. . . It was dark, it was right around between light and sun-up. . . It was dark, I had my lights on. I was driving a Chevrolet sedan automobile. I reached the railroad. I had been going at a rate of speed of around 15 miles an

hour. I slowed up slower than that when I reached the railroad. . . When I reached the second sidetrack I would say I was going 10 or 15 miles an hour. On approaching the railroad track I looked to see if I could see a train or engine on the track, and listened to see if I could hear a train or engine on the track. There was not any light burning on that railroad nor any bell ringing on the railroad. I was hit by the back end of the tender. I first saw the engine approaching, I would say, just the instant, a second, before it hit me. After I saw it I couldn't do anything to prevent it hitting me. . . The Georgia Railroad & Banking Company did not have some one preceding that train that hit me as it ran backwards. I couldn't tell how fast that engine was travelling that hit me. . . This collision occurred on Main Street in Thomson, Georgia. That street is largely travelled; it is the main thoroughfare through town, from Augusta and over in Carolina to Athens and Atlanta."

The plaintiff on cross-examination testified: "I go back and forth across that crossing six or eight times a day. . . That was on March 2, fast time, the same time as we have now. It would be a little lighter then. I had the lights on. You could see across the street. . . It was raining torrents that morning. I had my windshield wiper going. With reference to whether the left window was up, that window is cracked. It was raining on it. You could see out. I did not see the train because there was not any light going and there was not a flagman on the track. I slowed up. There were no buildings or trees or anything between me and the train that I know of; the only thing was the depot. I expect that was 75 or 125 or 150 feet. The engine had passed the depot when it hit me, I was on the crossing when it hit me. I couldn't tell you what it was that kept me from seeing the engine. I looked, naturally I looked, I don't cross it unless I do. I couldn't tell you what kept me from seeing it. I know I didn't see it. You didn't have a flagman on the track and the lights were not burning. That was one reason I didn't see it. . . It was light enough for me to see somebody across the street; you could see some. You could see something as big as a railroad engine; yet I didn't see it and didn't hear it, and didn't know it was there until two or three feet before it hit me. . . Referring to the glass on my left-hand side I spoke to a man in a car that morning. He was parked in the regu-

lar parking lot. I passed by him. I threw up my hand to him. That was right in the middle of the parking·lot; in the middle of Railroad Street. That was a distance of 10 or 12 feet, not over 15, on the left-hand side of the street. I was going down the middle of the street and he was in the first parking space. That was Mr. Langford. I didn't know who it was that morning. I didn't realize who it was until the last two or three weeks. I did not remember that I had spoken to him. He told me about it. . . I remember having thrown up my hand to speak to somebody. I did not remember it was Mr. Langford. I thought it was Hill Matthews I spoke to. I was 30 or 40 feet from the track when I spoke to Mr. Langford."

Mrs. Mildred Lokey testified for the plaintiff: "I am the wife of Earl Lokey. . . I recall the collision that his car had with the Georgia Railroad locomotive on March 2 of this year. . . It was very dark. We had to turn on our lights because of the fog and rain . ."

William Pilgrim testified for the plaintiff: "I was in the City of Thomson on the 2nd day of March, 1942, when a locomotive engine struck the automobile of Earl Lokey. I was standing in front of the Eagle Café that morning. The distance from there to the railroad I would say is 30 yards. I saw this collision. It was dark when the collision happened. It was drizzling rain and there was fog. I would say this train was backing around 25 miles an hour when it hit this automobile of Mr. Lokey. Mr. Lokey was not going fast as he was approaching the track. . . I thought he was going to pull in at the café, he was driving so slow. I imagine Mr. Lokey was driving 12 or 15 miles an hour. I did not see any light at all on the back of the engine. Those eyes, so to speak, were not winking on the side. There was no one on the ground preceding that engine until after the rain stopped. The engine dragged the car of Mr. Lokey 15 or 18 feet towards Atlanta before it stopped. . . I did not hear the bell of the engine ringing before and at the time it struck the car. It was not ringing. No whistle was blowing. I did not see anything done there by the engine crew to indicate that engine was going to be driven across that crossing. The flagman didn't have any lantern where it could be seen. . . I saw the engine before the collision took place. I could see further than 90 feet. With reference to whether there

was any reason Mr. Lokey could not see the train as well as I could, he was not standing out there on the sidewalk. I don't know whether there was any reason he could not see the train as well as I could."

A. T. Langford testified for the plaintiff: "It was raining and kind of foggy. . . You could see everything all right. . . Lokey was running around 15 miles an hour, I guess, slowing up for the station. The bell to that engine was not ringing at the time the engine approached the crossing. I never saw any lights at all. Those winking eyes or lights that indicate the approach of a train . . were not working. There was no bell ringing or no lights burning at all that I saw, and I was facing the track. There was no man or flagman preceding that engine as it backed. . . I saw the engine coming out from behind the depot. I saw it all the way as it got to the crossing. . . I was on this side of the center line of Railroad Street, where I parked. . . I had a plain view."

A certified copy of an ordinance of the City of Thomson was introduced in evidence by the plaintiff which made it unlawful to operate an engine through Thomson in excess of 12 miles per hour and fail to signal the approach of an engine to a crossing in said town by tolling the bell thereon.

The testimony of defendant's witnesses was to the effect that the engine was running at a rate of speed much less than 12 miles per hour; that the bell on the engine was ringing; that the crossing signal mechanism was operating and that a flagman preceded the engine with an electric lantern.

Counsel for the railroad contend that the plaintiff was not entitled to recover as a matter of law for the reason that if the defendant was negligent he could have discovered it by the exercise of ordinary care, and could have avoided its consequences by the exercise of ordinary care, the argument being that the plaintiff's testimony to the effect that he looked for an engine and did not see it was manifestly untrue. Under the evidence we do think that it should be held as a matter of law that the plaintiff should have seen the engine at whatever time he looked for it. He did not swear exactly when he looked for it. He may have looked when the engine was 75 or 60 feet away. Plaintiff was in a closed automobile. It was dark, foggy, and pouring rain. We think it was

entirely possible under the circumstances for the plaintiff to have failed to see the engine approaching. The same conclusion has been reached by the courts of this State in cases very similar to this one. *W. & A. R. Co.* v. *Ferguson,* 113 *Ga.* 708 (39 S. E. 306, 54 L. R. A. 802); *Central of Georgia Ry. Co.* v. *Leonard,* 49 *Ga. App.* 689 (176 S. E. 137); *Southern Ry. Co.* v. *Alexander,* 59 *Ga. App.* 852 (8) (2 S. E. 2d, 219); *Wilson* v. *Pollard,* 62 *Ga. App.* 781 (10 S. E. 2d, 407); *W. & A. R.* v. *Mathis,* 63 *Ga. App.* 172 (10 S. E. 2d, 457). The testimony of other witnesses to the effect that they could see the train, if believed by the jury, would not necessarily mean that the plaintiff's testimony was false, for the reason that the plaintiff's location and surrounding circumstances were different. The plaintiff was in a closed, moving vehicle, in the rain and with his windshield wiper operating. The case of Southern Railway Co. *v.* Smith, 86 Fed. 292 (40 L. R. A. 746), is clearly distinguishable. In that case it was daytime. The plaintiff was in possession of sight and hearing. The plaintiff swore that he looked for the train. The court said in effect that the statement that he looked for the train and did not see it when there was no reason why he couldn't have seen it was obviously false. But that is not this case as clearly appears from the facts. In *Ashworth* v. *East Tennessee, Virginia & Georgia Ry. Co.,* 97 *Ga.* 306 (23 S. E. 86) it did not appear that the injured person was not a trespasser. See *Southern Ry. Co.* v. *Barfield,* 112 *Ga.* 181 (37 S. E. 386); *Lassiter* v. *A. & W. P. R. Co.,* 61 *Ga. App.* 23 (5 S. E. 2d, 603); *Southern Ry. Co.* v. *Parkman,* 61 *Ga. App.* 62 (5 S. E. 2d, 685); *Southern Ry. Co.* v. *Hicks,* 61 *Ga. App.* 307 (6 S. E. 2d, 193). The contention of the railroad is without merit.

■ Mrs. Mildred Lokey was asked the question whether she saw on the person of her husband any evidence of an operation's having been performed. She answered: "Yes. I waited in the room all day Wednesday and they were continually carrying Earl in and out of the room. Maybe he would go out and stay an hour, roll him out on his bed, and come back, and maybe in five minutes another doctor would come and take him out, and then he would come back, and another, and that went all day. Wednesday night about 10:30 some one knocked on the door and it was Dr. Dandy's assistant. He came in then with his razors and shaved the back of Earl's head, I guess a place eight inches square, all over the hair.

That was about 10:30. They were preparing then for the operation which was to be performed the next morning at 7 o'clock, and I was to get there before Earl left the room and he had gone when I got there, about 10 minutes. He was out of the room then and they brought him back down, I think it was around 10 or 11 o'clock, I am not sure the hour he came back in the room." The objection to this testimony was that it was irrelevant and inadmissible and had no probative value on the issues involved in the case, and that it was the testimony of a layman as to a matter of only a technical significance, and therefore, if admissible at all, was admissible only from an expert witness who knew the technical significance of the matters testified to. Even if the testimony was not admissible it was not objected to as being prejudicial or harmful. It does not appear to have been harmful because the witness did not attempt to state the technical significance of the facts related, and the admission of the testimony was not shown to have been harmful error.

■ That testimony is not admissible is not a good ground of objection to its admission. *McDonald* v. *State*, 21 *Ga. App.* 125 (94 S. E. 262) ; *Legg* v. *Legg*, 165 *Ga.* 314 (140 S. E. 868).

■ The evidence was conflicting as to whether the cerebral atrophy from which the plaintiff was suffering could have been caused by the injuries alleged to have been received by him as a result of the collision with the engine. Under the evidence the atrophy was caused either by the injury or by excessive drinking. The contention that the verdict is excessive for the reason that the uncontradicted testimony of Dr. Walter E. Dandy was that the atrophy could not have been caused by the injuries is therefore without merit. Dr. Dandy testified: "The record shows that there was cerebral atrophy. It is quite possible to refer that condition to a traumatic cause. It would be either trauma or alcohol. If the symptoms you give are correct [that plaintiff was not unconscious after the injury] he could not have had atrophy resulting from trauma. If the symptoms he [plaintiff] gave are correct, he could have had an atrophy. If trauma was responsible, an atrophy could take place in a very few weeks." Dr. Dandy further testified that excessive use of alcohol over a period beyond two or three years could cause the atrophy, depending on the amount of alcohol consumed. The plaintiff testified that he had not drunk any alcohol for a period of five years before the collision, and there was evi-

dence that he was unconscious for a short time after the collision and injury. The court did not err in overruling the motion for new trial.

*Judgment affirmed. Stephens, P. J., and Sutton, J., concur.*